**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 19-cv-354

WILLIAM A. ANGELOVIC and RENEE ANGELOVIC,

      Plaintiffs,

v.

WRIGHT MEDICAL GROUP, INC.,
a Delaware corporation, and
WRIGHT MEDICAL TECHNOLOGY, INC.,
a Delaware corporation,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiffs William A. Angelovic and Renee Angelovic, by and through their undersigned attorneys, Burg, Simpson, Eldredge, Hersh and Jardine, P.C. and Shafner Law allege as follows:

**<u>PARTIES</u>**

      1.     Plaintiffs are residents of the State of Colorado. Plaintiff Renee Angelovic is the wife of Plaintiff William A. Angelovic.

      2.     Defendant Wright Medical Group, Inc., is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, TN 38117, and as such is a citizen of the State of Delaware and is a citizen of the State of Tennessee.

      3.     Defendant Wright Medical Technology, Inc., is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, TN 38117, and as such is a citizen of the State of Delaware and is a citizen of the State of Tennessee.

4.     Defendant Wright Medical Technology, Inc. is a subsidiary of Defendant Wright Medical Group, Inc.

5.     Defendant Wright Medical Technology, Inc., does business in the State of Colorado, and is registered to do business in the State of Colorado. Corporation Service Company, located at 1900 West Littleton Blvd., Littleton, CO 80120, is the Registered Agent for Defendant Wright Medical Technology, Inc., for service of process in the State of Colorado.

6.     Defendant Wright Medical Group, Inc. is not authorized to do business in the State of Colorado, but has conducted business within the State of Colorado by marketing and selling its products within the State of Colorado.

7.     At times throughout this Complaint, Defendants Wright Medical Group, Inc. and Wright Medical Technology, Inc. are collectively referred to as "Defendants."   At all times relevant herein, each of the Defendants were the representatives, agents, employees, servants, employees, partners, joint-venturers, or alter egos of the other Defendant and was acting within the scope of its respective authority by virtue of those interrelationships.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c) because a substantial part of the events giving rise to this claim occurred in the State of Colorado and this district.

10.     Since approximately 1999, the Defendants were global orthopedic medical device companies specializing in the design and manufacture of a total hip joint device known as the PROFEMUR® modular hip system that was marketed and sold, within the United States and the State of Colorado.

11.     Defendant Wright Medical Technology, Inc., and Defendant Wright Medical Group, Inc., or one or more of its predecessors, subsidiaries, or affiliates, including but not limited to Wright Medical Europe and Wright Cremascoli, designed, manufactured, tested, imported, labeled, marketed, distributed, and sold in the United States and the State of Colorado the Wright Medical PROFEMUR® modular hip system and its various components, including the PROFEMUR® titanium modular neck.

12.     In 2005, the Defendants marketed and sold the PROFEMUR® modular hip system in Longmont, Colorado, through a distributor known as Ken Holt & Associates.

13.     The PROFEMUR® modular hip system described in paragraph 11 was sold to and implanted in Plaintiff William A. Angelovic, in Longmont, Colorado, on March 14, 2005. On July 10, 2017, the PROFEMUR® titanium modular neck component of the PROFEMUR® modular hip system broke, while implanted in Plaintiff William A. Angelovic, as a result of defects contained within the PROFEMUR® modular hip system.

14.     On January 9, 2014, Wright Medical Group, Inc., "together with its Subsidiaries," as a "global orthopedic medical device company specializing in the design, manufacture and marketing of devices and biologic products for extremity, hip and knee repair and reconstruction" closed the sale of the OrthoRecon business of Wright Medical Technology, Inc., including its

ownership of and rights to the PROFEMUR® modular hip system, to MicroPort Medical B.V., a subsidiary of MicroPort Scientific Corporation.

## FACTUAL BACKGROUND

### The Defendants' Corporate History

15.     Beginning in approximately 1985, a European manufacturer of artificial hip devices known as Cremascoli Ortho ("Cremascoli"), designed, manufactured, tested, and sold in Europe, the PROFEMUR modular hip system, including the PRO-FEMUR–R Revision Hip System, which was comprised of separate femoral-side modular components including a femoral stem, a mid-body, a  titanium modular neck, and a femoral head.

16.     The titanium modular neck component of the Cremascoli Ortho PROFEMUR modular hip system, as designed in approximately 1985, had a cylindrical Morse taper on the proximal end of the neck to which the modular femoral head was affixed, and an oval Morse taper on the distal end of the neck that was designed to be inserted into a corresponding oval pocket in proximal end of the PROFEMUR femoral stem.

17.     The titanium modular neck component of the Cremascoli Ortho PROFEMUR modular hip system, as designed in approximately 1985, was assigned the Cremascoli Ortho model number prefix of "PPG."

18.     In approximately 1999, Cremascoli made a design change to its PPG model titanium modular neck by reducing the thickness of the mid-body of the neck between the proximal and distal end tapers. The reduction of the mid-body of the neck was done to increase the range of motion of the PROFEMUR modular hip system when implanted in patients.

19.     The design modification to the Cremascoli PROFEMUR titanium modular necks described in paragraph 18 did not alter or modify the dimensions or design of either the round cylindrical proximal taper or the oval distal taper of the modular neck, nor was there any change of the dimensions or design of the stem pocket of the PROFEMUR femoral stems.

20.     Prior to 1999, Cremascoli knew that the model PPG titanium modular necks of its PROFEMUR modular hip system were breaking while implanted in patients.

21.     Prior to 1999, Cremascoli knew that the model PPG titanium modular necks of its PROFEMUR modular hip system were breaking at the location of the distal oval taper at the neck / femoral stem junction.

22.     Prior to 1999, Cremascoli knew that the model PPG titanium modular necks of its PROFEMUR modular hip system were breaking at the location of the distal oval taper at the neck / femoral stem junction due to micromotion, fretting, fretting corrosion and fatigue failure.

23.     Prior to 1999, Cremascoli knew the breakage of the PPG titanium modular necks described in paragraphs 20-22 were breaking as a result of the patients engaging in the normal activities of daily living.

24.     In approximately 1999, Defendant Wright Medical Technology Inc. purchased Cremascoli.

25.     Upon purchasing Cremascoli, Wright Medical Technology, Inc., became the owner of the Cremascoli PROFEMUR modular hip system including the European and United States patents issued to Cremascoli covering the Cremascoli PROFEMUR modular hip system.

26.     At the time Defendant Wright Medical Technology Inc. purchased Cremascoli, Defendant Wright Medical Group Inc., was formed as the parent company of Wright Medical Technology Inc., and Cremascoli.

27.     At the time of the purchase of Cremascoli by Wright Medical Technology, Inc., modular hip systems such as the PROFEMUR modular hip system and PRO-FEMUR-R Revision Hip System, were promoted as having the benefit for the surgeon to customize the fit of the device to a particular patient's anatomy, including leg length and offset angle of the natural hip joint.

28.     At the time of the purchase of Cremascoli by Wright Medical Technology, Inc., modular hip systems such as the PROFEMUR modular hip system and PRO-FEMUR-R Revision Hip System were criticized by surgeons because the modular components were known to be subjected to micromotion, fretting, and fretting corrosion at the connecting junctions of the modular components. It was known prior to 1999 that micromotion, fretting, fretting corrosion could lead to fatigue failure and breakage of the modular components while implanted in patients.

29.     At the time Wright Medical Technology, Inc. purchased Cremascoli, the criticisms of modular hip devices set out in paragraph 28 were known to the Defendants.

30.     At the time Defendant Wright Medical Technology, Inc. purchased Cremascoli and the PROFEMUR modular hip system, the former facilities, property, and employees of Cremascoli located in Europe became the facilities, property, and employees of Wright Medical Technology, Inc.

31.     At the time Defendant Wright Medical Technology Inc., purchased Cremascoli, the former facilities, property, and employees of Cremascoli described in paragraph 30 became known as Wright Medical Europe and/or Wright Cremascoli

32.     Wright Medical Europe and/or Wright Cremascoli were corporations or other business entities with a manufacturing plant in Toulon, France, research and development facilities in Milan, Italy, and distribution facilities throughout Europe, and at times relevant hereto, was an affiliate or wholly owned subsidiary of Defendants Wright Medical Group, Inc. and Wright Medical Technology, Inc.

**The Defendants' Sale of the PROFEMUR® Modular Hip System Using the Section 510(k) Premarket Notification Process**

33.     On September 26, 2000, Wright Medical Technology, Inc. submitted a Section 510(k) premarket notification of intent to market the PRO-FEMUR-R Revision Hip System to the United States Food and Drug Administration (FDA) asserting the PRO-FEMUR-R Revision Hip System was substantially equivalent to competitive devices previously cleared for market and that the device conformed to FDA Section 510(k) guidance documents.

34.     Prior to September 26, 2000, the Defendants Wright Medical Group, Inc. and Wright Medical Technology, Inc., through Wright Cremascoli and Wright Medical Europe, knew that Cremascoli model PPG modular titanium necks that were a component part of the PRORFEMUR modular hip system sold in Europe had broken while implanted in patients beginning in the 1990s.

35.     In its Section 510(k) premarket notification, dated September 26, 2000, referred to in paragraph 33, Defendant Wright Medical Technology, Inc., did not advise the FDA that it knew that modular titanium necks that were a component part of the PRO-FEMUR–R Revision

Hip System sold in Europe had broken while implanted in patients beginning in the 1990s, and that the cause of the breakage of the titanium modular necks was due to micromotion, fretting, fretting corrosion, and fatigue failure at the location of the oblong neck taper of the titanium modular necks near the stem / neck junction of the PRO-FEMUR–R Revision Hip System, and while the patients were engaged in normal activities of daily living.

36.     Pursuant to the Section 510(k) premarket notification, on December 13, 2000, Wright Medical Technology, Inc., received clearance from the United States Food and Drug Administration (FDA) to distribute and sell in the United States the PRO-FEMUR-R Revision Hip System, along with the hip system's titanium modular necks under 510(k) number K003616.

37.     The FDA never tested the safety or effectiveness of the PRO-FEMUR-R Revision Hip System, nor titanium modular necks that were a part of that hip system, but instead concluded, based on the representations by the Defendants, that the PRO-FEMUR-R Revision Hip System was substantially equivalent to other already legally marketed devices in the United States.

38.     After December 13, 2000, Wright Medical began to manufacture, label, market, promote, distribute, and sell in the United States and the State of Colorado the PROFEMUR-R Revision Hip System, which included the PROFEMUR® titanium modular neck.

39.     Prior to April 26, 2002, Wright Medical Group, Inc.—referring to itself as a global orthopaedic device company specializing in the design, manufacture and marketing of reconstructive joint devices—announced that Wright Medical Group, Inc. was developing a version of the PRO-FEMUR-R Revision Hip System, known as the STEM hip replacement system, for use in primary hip surgeries.

40.    The Defendants Wright Medical Group, Inc. and Wright Medical Technology, Inc. re-branded and expanded the PROFEMUR-R Revision Hip System and created the PROFEMUR® modular hip system product line, including the STEM hip replacement system, for use in patients needing primary total hip arthroplasty. The PROFEMUR® product line was a modular hip system that included the PROFEMUR® titanium modular neck and various sizes and designs of PROFEMUR® femoral stems. At times, the PROFEMUR® product line was referred to as the Wright Medical PROFEMUR® total hip system or the Wright Medical PROFEMUR® modular hip system.

41.    Prior to 2005, the PROFEMUR® modular hip system included a femoral stem known as the PROFEMUR® E stem.

42.    Prior to 2005 and including March 14, 2005, the Wright Medical PROFEMUR E stem, with titanium modular neck, was not cleared by the FDA pursuant to the Section 510(k) premarket notification process.

43.    Prior to and including March 14, 2005, the Wright Medical PROFEMUR E stem was manufactured and sold by the Defendants in the United States and the State of Colorado based upon an internal Wright Medical Technology, Inc. "letter to file" claiming the PROFEMUR E stem did not require FDA 510(k) premarket notification clearance prior to distribution and sale within the United States and the State of Colorado.

44.    When the FDA learned the Defendants were selling the PROFEMUR E femoral stem based upon an internal "letter to file" the FDA compelled the Defendants to submit a Section 510(k) premarket notification for the PROFEMUR E stem.

45.     In August 2011, the Defendants submitted a Section 510(k) premarket notification to the FDA seeking clearance for the PROFEMUR E stem that was to be used only with PROFEMUR cobalt chrome modular necks.

46.     Prior to March 14, 2005, the Defendants learned of additional PROFEMUR modular titanium necks that were a component part of the PROFEMUR modular hip system sold in Europe that had broken while implanted in patients after December 13, 2000, and that the cause of the breakage of those titanium modular necks was due to micromotion, fretting, fretting corrosion, and fatigue failure at the location of the oblong neck taper of the titanium modular necks near the stem / neck junction.

### The Defendants' PROFEMUR® Titanium Modular Neck

47.     The Defendants' PROFEMUR® modular necks that were sold and distributed in the United States after December 13, 2000, and before June 15, 2009, were all made of a titanium-aluminum-vanadium alloy known as Ti6A14V ("Titanium").

48.     The Defendants' PROFEMUR® titanium modular neck, as designed, manufactured, tested, marketed, distributed, and sold in the United States and the State of Colorado after December 13, 2000, and before June 15, 2009, for use with various PROFEMUR® femoral stems, were manufactured in several models, six of which were generally identified by the Defendants as "short" necks (i.e. Ref. #s PHA0-1202, PHA0-1212, PHA0-1222, PHA0-1232, PHA0-1242, PHA0-1252), and six of which were generally identified as "long" necks (i.e. Ref. #s PHA0-1204, PHA0-1214, PHA0-1224, PHA0-1234, PHA0-1244, PHA0-1254). In addition, beginning in 2005, the Defendants designed, manufactured, marketed, distributed and sold in the United States and the State of Colorado, several models of extra-long titanium modular necks.

10

49.     The PROFEMUR® titanium modular necks with the model prefix PHA0 designation were substantially similar in their design, dimensions of the oblong taper, and manufacture, to the design, dimensions of the oblong taper, and manufacture of the titanium modular necks with the model prefix PPG referred to in paragraphs 17-23.

50.     In various marketing and promotional material published and distributed by the Defendants from approximately the year 2002, and into the year 2005, and available to the Defendants' sales representatives and distributors, surgeons, patients, and the general public, the Defendants made the following representations, statements, claims, and guarantees about the PROFEMUR® titanium modular neck:

> The modular neck used with the PROFEMUR® Hip has been employed by Wright Cremascoli for over 15 years. The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures. The necks are used in other Wright Cremascoli hip systems besides the PROFEMUR® Hip. None of the necks has experienced a clinical failure since their inception.
>
> …
>
> Extensive laboratory test have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion
>
> These excellent characteristics are obtained due to the particular geometry of the coupling. The base of the neck and the neck housing in the femoral implant have a patented oblong, conical profile which allows excellent stability under stress and the absence of all significant movement. The surface of the modular neck is finely machined to create spiral grooving. The crest of these grooves deforms when the neck is inserted into the neck housing ensuring contact and elimination of micromotion.

[Wright Medical Technical Monograph MH688-102 © 2004]

51.     In various marketing and promotional materials published and distributed by the Defendants from the year 2002, and into the year 2010, and available to the Defendants' sales representatives and distributors, surgeons, patients, and the general public, the Defendants made representations, statements, and claims about its PROFEMUR® modular hip system was intended for patients who wanted to return to an "active lifestyle."

52.     In various marketing and promotional material published and distributed by the Defendants from the year 2002, and into the year 2010, and available to the Defendants' sales representatives and distributors, surgeons, patients, and the general public, the Defendants made representations, statements, and claims about its PROFEMUR® modular hip system was intended for patients who wanted to return to an engage in various sporting, athletic, and lifestyle activities, such as tennis, running, sky diving, rock climbing, karate, racquetball, volleyball, basketball, wrestling, and heavy labor.

**The Defendants Fail to Report Fractures of the PROFEMUR® Titanium Modular Neck to the FDA**

53.     As referenced in paragraph 50, the Defendants claimed "none of the necks has experienced a clinical failure since their inception."

54.     Despite the claim referenced in paragraph 50 and 53, Defendants, through Wright Cremascoli and/or Wright Medial Europe, knew prior to 2005 of clinical failures in the form of fractures of its PROFEMUR titanium modular necks that had been implanted in patients in Europe, as referenced in paragraphs 20-23 above.

55.     Once the Defendants filed their 510(k) premarket notification to distribute and sell the PRO-FEMUR-R Revision Hip System in the United States as described in paragraph 33, Defendants had a duty to report to the FDA all instances of clinical failures of a fracture of a

PROFEMUR/PROFEMUR® titanium modular neck that had been implanted in a patient in Europe and the United States.

56.    Once the Defendants received clearance to distribute and sell the PROFEMUR® modular hip system in the United States as a result of its 510(k) premarket notification, the Defendants had a duty to report to the FDA any instances it knew of or received notice of a clinical failure in the form of a fracture of a PROFEMUR/PROFEMUR® titanium modular neck that had been implanted in a patient in Europe and the United States.

57.    Prior to April 19, 2005, the Defendants did not report to the FDA any of the instances it knew of or received notice of that Cremascoli PROFEMUR model PPG titanium modular necks had fractured in patients in Europe prior to January 1, 2005.

58.    Based upon information and belief, had the Defendants reported to the FDA the breakage of the titanium modular necks referenced in paragraphs 53-56 as required, the FDA would have withdrawn its premarket clearance, and/or required labeling changes, for the PROFEMUR® modular hip system, including the PROFEMUR-R hip revision system and the STEM hip replacement system STEM referred to in paragraph 40, based upon the cause of the fractures of the titanium modular necks.

59.    On or about April 19, 2005, the Defendants first reported to the FDA a PROFEMUR® model PHA01244 titanium modular neck clinical failure where a modular neck implanted in a patient had fractured at its distal oval Morse taper, where the taper seats into the pocket of the femoral stem.

60.    After receiving notice of a January 2005 PROFEMUR® titanium modular neck fracture in Europe, the Defendants received notice of additional PROFEMUR® titanium modular

neck clinical failures where the modular neck implanted in a patient had fractured at the distal oval Morse taper, where the taper seats into the pocket of the femoral stem.

61.     The number of PROFEMUR® titanium modular neck fractures has continued to increase over time, and continues to increase to the present day, now numbering more than 700 titanium modular necks that have broken while implanted in patients.

62.     All, or nearly all, of the PROFEMUR® titanium modular neck fractures referenced in paragraph 60 broke as a result of micromotion, fretting, fretting corrosion, and fatigue failure.

63.     All, or nearly all, of the PROFEMUR® titanium modular neck fractures referenced in paragraphs 61 and 62 broke at the same location of the neck, i.e. at the distal oval Morse taper where the taper seats into the pocket of the femoral stem.

### The Defendants Delay Warnings to Surgeons Until December 1, 2008

64.     The Defendants did not inform orthopedic surgeons in the United States known by it to have implanted its PROFEMUR® titanium modular necks of the reports it had received of titanium modular necks fracturing, nor did the Defendants voice any concern to those surgeons who had patients that experienced a fracture of a PROFEMUR® titanium modular neck, until the Defendants issued a December 1, 2008, "Safety Alert" to certain "Medical Professionals," which provided, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008. Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

65.     At the time the Defendants sent the December 1, 2008, Safety Alert, the Defendants were aware of more than 35 titanium modular neck fractures, if all of the modular

neck fractures known to the Defendants, including Cremascoli model PPG titanium modular necks that had occurred in patients in Europe, had been included in the total number of clinical fractures.

### The Defendants Failed to Properly Test the PROFEMUR Modular Hip System to Applicable ASTM and ISO Standards

66.     As part of the Section 510(k) premarket notification described in paragraph 33, the Defendants performed fatigue testing of the PRO-FEMUR-R Hip Revision System to the International Organization for Standardization ("ISO") test standards 7206-4 and 7206-8.

67.     At the time of the testing referenced in paragraph 66, the ISO testing protocol represented the minimum fatigue test recommended by the FDA for devices such as the PRO-FEMUR-R Hip Revision System.

68.     ISO test standards 7206-4 and 7206-8 contained minimum fatigue test loading criteria of 2300 Newtons, or 517 pounds force to five million cycles.

69.     At the time the Defendants performed the fatigue testing referenced in paragraph 66-68, the Defendants knew the amount of force a hip implant receives during reasonably expected activities of daily living in the foreseeable and expected patient population exceeded the ISO minimum loading criteria of 2300 Newtons, or 517 pounds force.

70.     At the time the Defendants performed the fatigue testing referenced in paragraphs 66-68, the Defendants knew that researchers such as Dr. Marco Viceconti, a Wright Cremascoli consultant, were alerting hip device manufacturers that the ISO 7206 loading criteria only tested hip devices to patient weights of 101-135 pounds and that the ISO 7206 loading criteria of 2300 Newtons underestimated the risk of device failure and breakage for patients who weighed in excess of 165 pounds.

71.     At the time the Defendants performed the fatigue testing referenced in paragraph 66, the Defendants knew the amount of force a hip implant receives during reasonably expected activities of daily living was generally accepted to be 3-6 times the patient's body weight.

72.     At the time the Defendants performed the fatigue testing referenced in paragraph 66, the Defendants knew the amount of force a hip implant receives during normal walking was 4.8 times the patient's body weight.

73.     At the time the Defendants performed the fatigue testing referenced in paragraphs 66-68, the Defendants knew that a force of 2300 Newtons only tested the PRO-FEMUR-R Revision Hip System to the amount of force for a patient weighing 108 pounds while walking at a speed of 3 miles per hour.

74.     At the time the Defendants performed fatigue testing of the PROFEMUR E stem, the Defendants knew or should have known the PROFEMUR® modular hip system with an E stem and long titanium neck had a fatigue strength of approximately 3500 Newtons.

75.     At the time the Defendants performed the fatigue testing referenced in paragraph 74, the Defendants knew or should have known that the fatigue strength stated in paragraph 74 would be reduced by up to 50% in a PROFEMUR E stem with associated fretting and corrosion to the titanium modular long neck.

76.     On September 10, 2003, the American Society for Testing ("ASTM") adopted ASTM F 2068-03. ASTM F 2068-03 set forth a new minimum test standard for use in hip replacement devices, including the PROFEMUR® modular total hip system with titanium modular neck.

77.     ASTM F 2068-03 required Wright Medical to test hip replacement devices, including the Wright Medical PROFEMUR® modular hip system and PROFEMUR titanium modular neck, to a minimum of 5340 Newtons, or 1200 pounds of force.

78.     After ASTM set out new minimum loading criteria as referenced in paragraphs 76 and 77, the Defendants should have performed fatigue testing to those minimum loading criteria.

79.     In September 2003, the Defendants knew the PROFEMUR® modular hip system with a long titanium modular neck would not pass the ASTM loading criteria referenced in paragraph 77.

80.     On October 31, 2003, Wright Medical launched its CONSERVE® Total Head with Big Femoral Head Technology to be included as a component part with the PROFEMUR® modular hip system. The Big Femoral Head increased the head size of the standard hip components to head sizes 36 millimeters through 56 millimeters, available in 2 millimeter increments.

81.     The coupling of a PROFEMUR® titanium long modular neck with a Big Femoral Head changed the worst-case scenario for the PROFEMUR® modular hip system.

82.     Because the worst-case scenario changed, beginning in October 2003, the Defendants should have retested the PROFEMUR® modular hip system to the new ASTM F 2068-03 standard of 5340 Newtons, or 1200 pounds force.

83.     In approximately June of 2008, the Defendants began testing the PROFEMUR® modular hip system with the titanium long modular neck and big femoral head to the ASTM F 2068-03 standard.

84.     As a result of the testing referenced in paragraph 83, the Defendants learned that the PROFEMUR® modular hip system with the long titanium modular neck and worst case head would fail the ASTM F 2068-03 loading criteria referenced in paragraph 77.

### The Defendants' Failure to Advise Surgeons of Weight Limitation for the PROFEMUR® Modular Hip System.

85.     For the years 1999-2002, the Centers for Disease Control listed the average weight for males age 50-59 years in the United States as 195.4 pounds.

86.     For the years 2003-2008, the Centers for Disease Control listed the average weight for males age 50-59 years in the United States as 198.8 pounds.

87.     For the years 2011-2014, the Centers for Disease Control listed the average weight for males age 50-59 years in the United States as 199.7 pounds.

88.     In the Defendants' Instructions for Use (IFU), issued January 2005, that accompanied the PROFEMUR® modular hip system distributed in the United States, the Defendants stated "absolute contraindications include: obesity where obesity is defined as three times normal body weight."

89.     Prior to March 14, 2005, the Defendants did not, in the IFU for the PROFEMUR® modular hip system distributed in the United States, include a warning, precaution, or other advisory as to the use of its PROFEMUR® modular hip system in patients who weigh more than a specifically stated body weight or had a body mass index (BMI) of any particular number or higher.

90.     Prior to March 14, 2005, the Defendants did not state in the IFUs for the PROFEMUR® modular hip system distributed in the United States that the use of the

PROFEMUR® modular hip system was contraindicated in patients who engaged in heavy lifting post-surgical implant.

91.     Prior to March 14, 2005, the Defendants did not state in the IFUs for the PROFEMUR® modular hip system distributed in the United States that the use of the PROFEMUR® modular hip system was contraindicated in patients planned to engage in impact sports post-surgical implant.

**The Defendants Replace the Titanium Long Modular Necks with
Long Modular Necks Made from Cobalt Chrome**

92.     Beginning in approximately 2007, the Defendants began the design and development process to replace the PROFEMUR® long titanium modular necks with long modular necks made from cobalt chrome, which were known to have approximately twice the fatigue strength of titanium alloy and be more resistant to fretting than titanium.

93.     The cobalt chrome modular necks referenced in paragraph 92 were designed to be approximately 1.5mm thicker at the minimum diameter of the middle body (distal to the cylindrical taper cone) to maximize the cross-sectional diameter. This was done to reduce the stress riser created by this radiused geometry and thereby evenly distribute the stress on the middle body surface.

94.     The Defendants decided to replace the PROFEMUR® long titanium modular necks with cobalt chrome because the fracture rate of the PROFEMUR® long titanium modular necks was unacceptable.

95.     The Defendants decided to replace the PROFEMUR® long titanium modular necks with cobalt chrome because the PROFEMUR® long titanium modular necks could not pass the ASTM loading criteria referenced in paragraph 77.

96.     On or after approximately June 15, 2009, the Defendants began distributing in the United States PROFEMUR® modular necks made with cobalt chrome.

97.     From a biomechanical engineering perspective, the manufacture of cobalt chrome modular necks was technically feasible in the year 2001.

98.     The engineering processes and technology to make PROFEMUR® modular necks from cobalt chrome was available and feasible in the year 2001.

99.     The production of PROFEMUR® modular necks from cobalt chrome rather than titanium does not significantly increase the cost to the Defendants to manufacture a modular neck.

100.    The manufacture of PROFEMUR® cobalt chrome modular necks by the Defendants did not result in a substantial increase in the cost of purchasing the product by the consumer, compared to the cost of a titanium modular neck.

101.    When the Defendants began to distribute PROFEMUR® cobalt chrome modular necks, the amount the Defendants charged for a PROFEMUR® cobalt chrome modular neck was less than $50 more than the price of a PROFEMUR® titanium modular neck of the same model.

102.    When the Defendants began to distribute PROFEMUR® cobalt chrome modular necks in the United States, those necks were made in the same six long models and the same six short models as the six long and six short models of the PROFEMUR® titanium modular necks.

103.    PROFEMUR® cobalt chrome modular necks distributed in the United States have the same dimensions at the proximal cylindrical Morse taper and at the distal oval Morse taper, as PROFEMUR® titanium modular necks, making the cobalt chrome necks compatible for assembly with the same PROFEMUR® femoral heads and femoral stems as the PROFEMUR® titanium modular necks.

104.    The PROFEMUR® cobalt chrome modular necks are less susceptible to fatigue fracture at the neck-stem junction than the otherwise similar models of titanium PROFEMUR® modular necks.

105.    After implantation, PROFEMUR® cobalt chrome modular necks are less likely to fracture at the neck-stem junction from cyclic loading and fatigue than the otherwise identical model of PROFEMUR® titanium modular necks.

106.    The production of PROFEMUR® cobalt chrome modular necks rather than titanium, is not known to the Defendants to significantly increase the risk of failure of the hip arthroplasty from other known potential medical complications, such as metallosis, aseptic lymphocytic vasculitis-associated lesions (ALVAL), adverse local tissue reaction (ALTR), or aseptic loosening of the acetabular component.

107.    Laboratory fatigue testing by the Defendants demonstrated no cobalt chrome neck fractures and no proximal stem fractures with cobalt chrome necks when tested to the ASTM F 2068-03 protocol and loading criteria.

**Wright Medical Advertising for Its PROFEMUR® Modular Hip System**

108.    Patient testimonials that have from time to time appeared on the Defendants' website and were available to the Defendants' sales representatives, distributors, surgeon customers, patients, and the public from 2005, and/or that appeared in printed materials published by the Defendants from 2005 through 2010, have represented that patients who received the PROFEMUR® modular hip system have already returned or are about to return to such activities as running, jogging, snow skiing, water skiing, running, tennis, basketball, volleyball, wrestling,

racquetball, and work that involves lifting and moving heavy objects, and karate among other activities.

109.    The Defendants' goal in using these patient testimonials was to advertise to future patients that the PROFEMUR® modular hip system would allow patients to return to the active lifestyle they enjoyed prior to developing a need for total hip arthroplasty.

110.    Patient testimonials that have from time to time appeared on the Defendants' website, and in printed materials published by Defendants from 2005 through 2010, have shown photographs of patients who received the PROFEMUR® modular hip system with titanium modular necks and who appear to weigh in excess of 250 pounds.

### The PROFEMUR® Modular Hip System Implanted in William A. Angelovic

111.    On March 14, 2005, Plaintiff William A. Angelovic, age 55, weighing 215 pounds, had a PROFEMUR® modular hip system implanted in his right hip at Longmont United Hospital, Longmont, Colorado.

112.    The PROFEMUR® modular hip system components implanted in Plaintiff's right hip on March 14, 2005, included the following devices and components:

a.  LINAGE® Shell Size 68mm, Group 3; REF: 3643-0058; LOT: 10491718; Ceramic Transcend Liner, Group 3; I.D. Size 32; REF: 3643-0058; LOT: 10491718.

b.  Ceramic Femoral Head; 32 mm; TAPER SLT; -3.5mm SHORT; Material: Alumina Oxide; REF: 2600-0007; LOT: 04478265.

c.  PROFEMUR® AR/VV; REF: PHA0-1224; LOT: U1188979; and

d.  PROFEMUR® E Stem; Size 9 BTD; PHA03146; Lot U0903026.

113.    At the time it was implanted in Plaintiff William A. Angelovic's right hip, the PROFEMUR® modular hip system described in paragraphs 110 and 111 was in the same condition in all relevant respects as when it was sold by and left the control of the Defendants.

114.    Dr. Daniel Ward, M.D. the surgeon who implanted Plaintiff William A. Angelovic with the PROFEMUR® components referenced in paragraph 111, did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of the Plaintiff in any of the following respects:

   a. In the care or treatment that he provided to Mr. Angelovic prior to beginning Mr. Angelovic's hip implant surgery;

   b. In the information that he did or did not provide Mr. Angelovic prior to beginning Mr. Angelovic's hip implant surgery;

   c. In the hip implant surgery he performed on Mr. Angelovic;

   d. In the care or treatment that he provided to Mr. Angelovic subsequent to Mr. Angelovic's hip implant surgery; and

   e. In the information that he did or did not provide Plaintiff Mr. Angelovic subsequent to Mr. Angelovic's hip implant surgery.

115.    Subsequent to the date of implant, Plaintiff William A. Angelovic used the PROFEMUR® modular hip system in a normal and expected manner.

116.    On or about July 10, 2017, the modular neck component of Plaintiff William A. Angelovic's PROFEMUR® titanium modular neck suddenly and catastrophically failed, breaking into two pieces while Plaintiff was walking.

117.    Upon information and belief, the titanium modular neck referred to in paragraph 116 broke as a result of micromotion, fretting, fretting corrosion and fatigue failure.

118.    On July 10, 2017, Plaintiff William A. Angelovic was 67 years old and weighed 230 pounds.

119.    On July 12, 2017, Dr. Peter Chiang surgically removed Plaintiff William A. Angelovic's PROFEMUR® modular hip system at Good Samaritan Medical Center, Lafayette, Colorado.

120.    In his operative report, Dr. Chiang stated that Plaintiff William A. Angelovic "was found to have a fracture of his modular neck of his total hip prosthesis," and that "the residual broken modular neck inside the femoral stem."

121.    As a result of the broken titanium modular neck, Dr. Chiang was forced to perform an extended trochanteric osteotomy to remove the PROFEMUR® E stem from its position in Plaintiff William A. Angelovic's femur. Dr. Chiang finalized the revision surgery by replacing Plaintiff William A. Angelovic's failed PROFEMUR® modular hip system with a Zimmer hip device.

122.    As a direct an proximate result of the breakage of the PROFEMUR® titanium modular neck as described in paragraphs 116-117 and the surgical procedure to remove the PROFEMUR® modular hip system described in paragraphs 119-121, Plaintiff William A. Angelovic sustained injuries and damages including but not limited to:

    a)    Being forced to undergo surgery to remove and replace the failed prosthesis;

    b)    Past and future pain, suffering and inconvenience;

    c)    Medical bills associated with the replacement procedure and recovery therefrom;

    d)    Future medical expenses;

     e)      Loss of enjoyment of life;

     f)      Disfigurement; and

     g)      Physical impairment.

123.    As a direct an proximate result of the breakage of the PROFEMUR® titanium modular neck as described in paragraphs 116-117 and the surgical procedure to remove the PROFEMUR® modular hip system described in paragraphs 119-121, Plaintiff Renee Angelovic, sustained a loss of her husband's consortium including loss of affection, society, companionship, household services, aid and comfort, which losses she believes to be permanent.

### FIRST CAUSE OF ACTION
**Strict Products Liability**
**Defect in Design**

124.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth at length and further alleges as follows:

125.    Defendants designed, manufactured, tested, marketed, distributed, and sold in Colorado the PROFEMUR® modular hip system that was implanted in Plaintiff William A. Angelovic as described in paragraphs 111-113.

126.    The PROFEMUR® modular hip system that was implanted in Plaintiff William A. Angelovic was in a defective condition that was unreasonably dangerous to Plaintiff William A. Angelovic at the time it was sold due to defects in the design of the product, including the following:

     a)    Prior to March 2005, the Defendants knew from mechanical testing that the PROFEMUR® modular hip system implanted in Plaintiff was not designed to withstand the stress and force of the reasonably foreseeable

loading which the product would experience during Plaintiff's ordinary and foreseeable activities of daily living, and which the Defendants knew would substantially exceed 2300 Newtons for five million cycles.

b) Prior to March 2005, the Defendants knew or should have known, through the use of finite element analysis, that the fatigue strength of the titanium modular neck of the PROFEMUR® modular hip system implanted in Plaintiff would be exceeded by Plaintiff's engagement in the reasonably expected activities of daily living.

c) The Defendants manufactured the model PHA01224 modular neck of the PROFEMUR® modular hip system implanted in Plaintiff from titanium rather than cobalt chrome for the reasons stated in paragraphs 93-106. Cobalt chrome was available and safer for use in the neck because Defendants knew that cobalt chrome was stronger and less apt to fret and corrode.

d) The Defendants designed the PROFEMUR® modular hip system with a modular neck designed to be inserted into a pocket in the proximal end of the femoral stem. Prior to March 2005, the Defendants knew that modular design would lead to micromotion, fretting, fretting corrosion, and fracture of the modular neck due to fatigue failure.

127.    Plaintiff William A. Angelovic's PROFEMUR® modular hip system with the titanium modular neck, as designed, manufactured, tested, distributed, marketed, and sold by the Defendants was defective and unreasonably dangerous in its design as described in paragraph 125, when it left the hands of the Defendants, because the foreseeable risk of the product exceeded the benefits associated with the design of the product.

128.    The defective condition of the PROFEMUR® modular hip system with the titanium modular neck implanted in Plaintiff and described in paragraphs 126-127 rendered the product unreasonably dangerous.

129.    The design defects of the PROFEMUR® modular hip system with the titanium modular neck stated in paragraphs 126-128 existed when the product left the Defendants' control.

130.    As a direct and proximate result of the design defects in the Defendants' PROFEMUR® modular hip system, as described in paragraphs 126-129, Plaintiffs suffered harm, damages, and economic loss as described in paragraphs 122 and 123.

**SECOND CAUSE OF ACTION**
**Strict Product Liability**
**Defect Due to Inadequate Warnings**

131.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth at length and further alleges as follows:

132.    Based upon the allegations set forth above, Plaintiff's Wright Medical PROFEMUR® modular hip system with titanium modular neck was defective for the reason the Defendants knew or should have known that the product created significant risks of serious

bodily harm to consumers, including Plaintiff, for which the Defendants failed to adequately warn consumers and/or their health care providers of such risk.

133.   The Defendants failed to warn and instruct surgeons and consumers of the dangers and risks stated in paragraphs 20-23, 28-29, 34-35, 42-46, 53-65, 69-75, 79, 84, 89-91, and failed to report to the FDA the breakage of titanium modular necks as referenced in paragraph 58.

134.   The Defendants further knew, prior to March 2005, that statements contained in paragraph 50 were false.

135.   As a direct and proximate result of the Defendants' defective instructions and warnings, and their failure to report to the FDA as referred to in paragraphs 131-135, Plaintiffs suffered harm, damages, and economic loss as alleged in paragraphs 122 and 123.

### THIRD CAUSE OF ACTION
**Negligence**

136.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in at length and further alleges as follows:

137.   Defendants owed a duty to exercise reasonable care in the design, manufacture, testing, marketing distributing, sale, and/or post-sale surveillance of Defendants' PROFEMUR® modular hip system with the titanium modular neck.

138.   Defendants failed to exercise ordinary care in the design, manufacture, testing, quality assurance, quality control, marketing, sale, warning and instructing, FDA notification, and/or post-sale surveillance of Defendants' PROFEMUR® modular hip system with the titanium modular neck, as described in paragraphs 20-23, 28-29, 34-35, 42-46, 49, 53-65, 69-75,

78-79, 82, 84, 89-91, because Defendants knew or should have known that Defendants' PROFEMUR® modular hip system with the titanium modular neck could cause significant bodily harm and death from failure (fracture) of the titanium modular neck and was thus not safe for implantation to consumers. Despite the fact that Defendants knew or should have known of the risks and dangers represented in the allegations set out above, the Defendants continued to manufacture and market the PROFEMUR® modular hip system with the titanium modular neck for implant into patients.

139.    Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of the Defendants' failure to exercise ordinary care as described above.

140.    As a direct and proximate result of the Defendants' failure to exercise reasonable care as described above, Plaintiffs suffered harm, damages, and economic loss as alleged in paragraphs 122 and 123.

WHEREFORE Plaintiffs respectfully pray for compensatory damages in their favor and against Defendants to compensate them for the injuries, losses, and damages as alleged in paragraphs 122 and 123, in an amount to be determined by the trier of fact, together with prejudgment interest as allowed by law, post-judgment interest as allowed by law, costs and expenses as allowed by law, witness fees, deposition expenses, attorney fees as allowed by law, and for such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands trial by jury as to all issues so triable.

Respectfully submitted this 11th day of February, 2019.

**BURG SIMPSON
ELDREDGE HERSH & JARDINE, P.C.**
*(Original signature on file at Burg Simpson Eldredge Hersh &
Jardine, P.C.)*

*s/  Peter W. Burg*
Peter W. Burg, Reg. No. 10149
Meghan C. Quinlivan, Reg. No. 38503
David J. Crough, Reg. No. 47528
40 Inverness Drive East
Englewood, Colorado 80112
(303) 792-5595
pburg@burgsimpson.com
mquinlivan@burgsimpson.com
dcrough@burgsimpson.com

and

**SHAFNER LAW**

s/ Alan C. Shafner
Alan C. Shafner, Reg. No. 9508
5350 S. Roslyn St., Suite 460
Greenwood Village, CO 80111
(303) 796-0555
alan@shafnerlaw.com

*Attorneys for Plaintiffs*